422 A.2d 124

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Frank J. WADZINSKI, Appellant.**

Supreme Court of Pennsylvania.

Argued April 14, 1980.

Decided Sept. 22, 1980.

38

James F. Geddes, Jr., Wilkes Barre, for appellant.

Chester Muroski, Dist. Atty., Michael C. Kostelaba, Asst. Dist. Atty., Wilkes Barre, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

KAUFFMAN, Justice.

The issue presented in this appeal is whether Section 1614 of the Pennsylvania Election Code is unconstitutional because it imposes criminal sanctions upon a candidate for public office who publishes a political advertisement referring to an opponent without first complying with prescribed notice requirements.[1] For the reasons set forth below, we

1. Act of June 3, 1937, P.L. 1333, Art. XVI, § 1614, *added*, Act of December 28, 1972, P.L. 1658, No. 353 § 1, 25 P.S. § 3234 (Supp. 1978–1979) (hereinafter "Section 1614"), provides in relevant part:
 (a) No candidate for public office, or political committee or party acting on his behalf, shall place any advertisement referring to an

conclude that Section 1614 unreasonably restricts protected speech in contravention of the First and Fourteenth Amendments to the United States Constitution.[2]

## I

Appellant, Frank J. Wadzinski, a candidate for mayor of the City of Nanticoke in 1973, made a paid political radio broadcast on the day before the November 6, 1973 election. In the broadcast, appellant referred to his opponent, the incumbent mayor: (1) noting that a charge of perjury was pending against him, (2) criticizing his performance as mayor, and (3) attacking his indebtedness to "special interests."

Following the election, appellant was convicted of violating Section 1614 for failing to give the requisite advance notice of the contents of his broadcast.[3] Appellant thereaft-

opposing candidate for the same office which is to be broadcast or published during the forty–eight hours immediately prior to an election or published in a weekly newspaper or periodical during the eight days immediately prior to an election, with a television or radio broadcasting station, newspaper or periodical, unless he has first given a copy of the material to appear or be used in the advertisement and reasonable notice to the opposing candidate and the County Board of Elections of the county where the advertisement is to be placed in sufficient time for a reply advertisement to be published or broadcast at the same approximate time or in the same issue of the publication or on the same radio or television broadcast as the original advertisement and prior to the election in question.

(b) The reasonable notice referred to in subsection (a) of this section shall be given in writing by registered mail, return receipt requested, addressee signature only. . . .

2. The First Amendment, in pertinent part, provides: "Congress shall make no law . . . abridging the freedom of speech, or of the press . . ." U.S.Const. amend I. The First Amendment's free speech guarantee was first held applicable to the states via the Fourteenth Amendment in *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). *See also Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); U.S.Const. amend. XIV.

3. Since a violation of Section 1614 was, at the time of this prosecution, a summary offense, appellant was not entitled to a jury trial. A violation of Section 1614 was punishable by a fine not exceeding $300.00 or, in default of the payment thereof, imprisonment for not more than 30 days. 25 P.S. § 3234(c) (Supp.1978–1979). Appellant was assessed a fine of $25.00.

er filed a petition for a writ of certiorari in the Court of Common Pleas of Luzerne County challenging, *inter alia*, the constitutionality of Section 1614 on First and Fourteenth Amendment grounds. That court dismissed the writ, holding that the constitutional question was not cognizable on appeal by writ of certiorari and, in the alternative, that appellant's constitutional claim was without merit. The Superior Court affirmed the dismissal on the procedural ground without reaching the merits of appellant's constitutional challenge. *Commonwealth v. Wadzinski*, 239 Pa.Super. 76, 361 A.2d 790 (1976). This Court granted allocatur and reversed and remanded for a decision on the merits. *Commonwealth v. Wadzinski*, 485 Pa. 247, 401 A.2d 1129 (1978).[4] On remand, the Superior Court upheld the constitutionality of Section 1614 and affirmed appellant's conviction. *Commonwealth v. Wadzinski*, 266 Pa.Super. 56, 403 A.2d 91 (1979).

Because this appeal presents an important and unsettled question of constitutional law, we again granted allocatur.[5]

## II

The Pennsylvania Election Code was enacted to regulate the electoral process so that it is both orderly and fair. The purpose of Section 1614 is to prevent misleading, false, or scandalous campaign charges, published immediately prior to an election, from going unrebutted and thus improperly

---

4. In a unanimous opinion, this Court concluded that although appellant had committed a procedural error raising his constitutional challenge by means of a writ of certiorari, he nevertheless was entitled to a decision on the merits:

 [I]n light of the changes in the court structure and the practice and procedure in recent years, a procedural mistake such as appellant made here should no longer prove fatal. There is today no justifiable reason to send appellant from pillar to post without a hearing on his basic claim of unconstitutionality of the statute under which he was prosecuted.

 *Commonwealth v. Wadzinski*, 485 Pa. 247, 255, 401 A.2d 1129, 1133 (1978).

5. Jurisdiction is vested in this Court pursuant to the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S.A. § 724(a) (Pamph.1979).

swaying the result of the election.[6] Accordingly, the statute places no direct restraint on the content of election–eve speech, but, instead, gives each candidate an opportunity to respond to widely publicized commentary published by his opponent just before the balloting begins.

Section 1614 thus requires a candidate who intends to publish a political advertisement referring to an opponent during the statutorily defined final days of a campaign to provide the opponent with "reasonable notice" of the contents of the advertisement. Reasonable notice is defined as notice that is sufficient to permit the opponent to publish a reply advertisement contemporaneously with or at the same approximate time as the original. As construed by the Superior Court in a previous constitutional challenge, the notice requirements of Section 1614 are imposed only on original, and not on reply, advertisements that make reference to an opponent. *Commonwealth v. Suplee*, 255 Pa.Super. 351, 387 A.2d 85 (1978).[7]

In 1973, a violation of Section 1614 was a summary offense punishable by a fine or, in default thereof, imprisonment.[8] Proof of the offense is complete upon a showing that the defendant, without providing the requisite advance

6. *See* Pa.Legis.J. § 1328–30 (daily ed. May 9, 1972). Section 1614 was proposed after this Court invalidated a portion of Article 1, Section 7 of the Pennsylvania Constitution following the decision of the United States Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *See Commonwealth v. Armao*, 446 Pa. 325, 286 A.2d 626 (1972).

7. The defendant in *Suplee* was prosecuted for failing to provide his opponent with notice of a "reply" advertisement. The Superior Court held that Section 1614 did not apply, noting that to require replying candidates to provide notice of their advertisements would result in an infinite series of notices and counter–notices, and that the legislature did not intend such an absurd and unwieldy system. 255 Pa.Super. at 354–55, 387 A.2d at 87. Accordingly, the Superior Court did not reach the general constitutional challenge. *Id.*, 255 Pa.Super. at 352 n.2, 387 A.2d at 86 n.2. *But see* 255 Pa.Super. at 362–67, 387 A.2d at 90–93 (Hoffman, J., dissenting).

8. In 1978, Section 1614 was made a misdemeanor with more restrictive provisions by the Act of October 4, 1978, P.L. 893, No. 171, 25 P.S. § 3258(b) (Supp.1979–1980).

notice, published in the designated media a political advertisement referring to an opponent. Thus, the truth or falsity of the statements made is wholly irrelevant to the applicability of criminal sanctions. In addition to the post–publication criminal penalties expressly provided for by Section 1614, further penalties may be imposed by provisions of the Pennsylvania Election Code. A willful violator of Section 1614 may forever be disqualified from holding public office, 25 P.S. § 3551, and may be disabled from voting for a period of four years from the date of conviction. 25 P.S. § 3553. See Pa.Const. art. 8, § 9.

## III

In essence, appellant contends that these combined sanctions will deter political expression protected by the First and Fourteenth Amendments.[9] In response, the Commonwealth argues that Section 1614 is a content neutral law that operates to encourage, not to deter, the free flow of political information. Accordingly, the Commonwealth contends that the statute is likely to promote First Amendment freedoms. It is further argued that any incidental deterrent effect on protected speech occasioned by Section 1614 is fully justified by the state's overriding interest in enabling voters to make a reasoned choice at the polls.[10] We disagree with

9. Appellant also contends that Section 1614 constitutes an unlawful prior restraint and is unconstitutionally vague. Because of our resolution of this appeal, we need not reach either of these issues.

10. The Commonwealth also asserts that the appellant, who was prosecuted for conduct clearly prohibited by the statute, lacks standing under federal law to challenge the facial constitutionality of Section 1614 because his vagueness and overbreadth attacks posit hypothetical situations not before this Court. This argument need not detain us. Assuming that we as a state court are bound by Article III requirements when adjudicating a federal constitutional claim, and this assumption is a radical one indeed, cf. Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), it is clear to us that under the special federal standing rules applicable to the First Amendment area, appellant's facial challenge is proper. In First Amendment cases, the traditional rules of standing have been altered to permit challenges to the facial validity of a statute "with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with

the Commonwealth and conclude that Section 1614 sweeps far too broadly and, in so doing, impermissibly intrudes upon constitutionally protected speech.

## IV

 The constitutional limits upon state regulation of campaign speech have yet to be fully defined. *See generally* L. Tribe, *American Constitutional Law,* § 13–26 at 798–99 (1978); *Developments in the Law, Elections,* 88 Harv.L.Rev. 1111, 1272–1298 (1975). Nevertheless, the basic propositions that govern a First Amendment challenge to such laws are well settled. We begin with the general premise that the First Amendment's guarantee of freedom of expression has long been among our most fundamental and carefully guarded rights. "Whatever the explanation for the ascendancy of the First Amendment protection, courts have remained particularly sensitive to government regulation that tends to impinge on expressive freedom." *Alderman v. Philadelphia Housing Authority,* 496 F.2d 164, 168 (3d Cir. 1974), *cert. denied,* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974). There is practically universal agreement that free discussion of candidates for political office is essential to the

the requisite narrow specificity." *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). "Litigants, therefore, are permitted to challenge a statue not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* In this case, it is apparent that Section 1614 affects on its face First Amendment rights. It is not concerned with the regulation of conduct but with the regulation of speech itself in the form of paid political advertisements. As is evidenced by the present prosecution, the threat of enforcement is real, and will deter many candidates from publishing political advertisements when the required notice cannot realistically be given. That appellant did publish in violation of the statute does not disentitle him from asserting the rights of those potential speakers, for the very premise of an overbreadth analysis is that the " 'sword of Damocles' [should not be allowed] to hang over a significant range of protected and yet easily deterred" First Amendment choices. L. Tribe, *American Constitutional Law,* § 12–25 at 713. In our view, the standing requirements enunciated in *Broadrick v. Oklahoma, supra,* are therefore fully satisfied.

functioning of a democratic society. *Mills v. Alabama*, 384 U.S. 214, 218–19, 86 S.Ct. 1434, 1436–37, 16 L.Ed.2d 484 (1966). Such discussions are afforded "the broadest protection" in order to "assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976). *See also Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957). This broad grant of protection reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide–open." *New York Times Co. v. Sullivan, supra*, 376 U.S. at 270, 84 S.Ct. at 720 (1964). Accordingly, the First Amendment guarantee of free speech "has its fullest and most urgent application to the conduct of campaigns for public office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971).

■ These principles have been forcefully applied by the United States Supreme Court in *Mills v. Alabama*, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), and *Miami Herald Publishing Company v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Both cases dealt with legislation regulating political speech. In *Mills*, the state, purportedly in order to prevent the publication of irrefutable, last–minute charges in election campaigns, imposed criminal sanctions for the publication on election day of editorials urging voters to support a particular candidate or position. The statutory ban against such editorials applied without regard to the truth or falsity of the editorial advocacy. The Court, sustaining a First Amendment challenge, held that "no test of reasonableness" could save such a state law from invalidation. 384 U.S. at 220, 86 S.Ct. at 1437. In *Tornillo*, the state granted a political candidate a statutory right to equal space to answer criticism and attacks on his record made by a newspaper, and made it a misdemeanor for the newspaper to fail to comply. Under this "right to reply" statute, a newspaper could freely criticize any candidate as long as it undertook the burden of publishing the candidate's reply.

The Court found the statute constitutionally infirm because of the possibility that it might chill vigorous political debate, 418 U.S. at 256–57, 94 S.Ct. at 2838–39, and because it permitted governmental intrusion into the editorial function. *Id.* at 258, 94 S.Ct. at 2839. Both of these cases, then, stand for the proposition that outright legislative restrictions substantially limiting election debate or advocacy violate the First Amendment.

 It follows from the principles and precedents enunciated above that any state law regulating campaign speech requires, in the face of a properly presented First Amendment challenge, the most exacting judicial scrutiny. This is not to say, however, that any attempt to regulate this subject matter is automatically unconstitutional. First, it is clear that not all speech uttered during the course of a political campaign is constitutionally protected. "[T]he use of the known lie as a tool [for political ends] is at once at odds with the premises of a democratic government and with the orderly manner in which economic, social or political change is to be effected." *Garrison v. Louisiana,* 379 U.S. 64, 85, 85 S.Ct. 209, 221, 13 L.Ed.2d 125 (1964). Calculated falsehoods delivered during a campaign are accordingly subject to no greater constitutional immunity than such statements receive when made in other contexts. It is thus clear that a state may apply its general laws of defamation to political speech in order to protect the reputational interests of its citizens so long as such laws comport with the "actual malice" standard enunciated by the United States Supreme Court in *New York Times Company v. Sullivan, supra.* See *Ocala Star–Banner Co. v. Damron,* 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971); *Monitor Patriot Co. v. Roy, supra.* Likewise, state regulation whose scope is limited to false campaign statements knowingly or recklessly made may be sustained. *New York Times Company v. Sullivan, supra.* See *Vanasco v. Schwartz,* 401 F.Supp. 87 (E.D.N.Y.1975), *summarily affirmed,* 423 U.S. 1041, 96 S.Ct.

763, 46 L.Ed.2d 630 (1976). *See generally Developments in the Law, Elections, supra*, 88 Harv.L.Rev. at 1279–80.

Further, it is clear that some regulation of campaign speech designed to protect other than reputational interests may be sustained. For example, in *Buckley v. Valeo, supra*, federal statutory limitations on political contributions and requirements that candidates disclose the sources of their campaign funding were sustained against First Amendment challenges. The Court rejected the argument that these limitations and requirements tended to reduce the quantity of political expression and to chill the freedom of political association. *Buckley* thus teaches that the governmental interests in ensuring that the electorate is fully informed and in preventing the corruption of the political process may in limited instances be sufficiently compelling to justify narrowly tailored laws necessary to further those interests, even though such legislation may have an incidental impact upon First Amendment freedoms.[11] We hasten to add, however, that these interests will not justify any law that places a substantial burden on protected political speech. Thus, even though Section 1614 was intended to further the goal of election reform recog-

11. In *Commonwealth v. Evans*, 156 Pa.Super. 321, 40 A.2d 137 (1945) (allocatur refused), the Superior Court held constitutional the section of the Election Code that prohibited the distribution of anonymous political matter. Similarly, our courts have upheld the constitutionality of legislation that (1) prohibited publication of matter reflecting upon the character or actions of an opposing candidate without simultaneous disclosure of source, *Commonwealth v. Acquaviva*, 187 Pa.Super. 550, 145 A.2d 407 (1958) (allocatur refused) (2) prevented "macing," *Commonwealth v. Zegar*, 200 Pa.Super. 92, 186 A.2d 922 (1962), and (3) restricted certain public employees from taking part in political activity. *Farview v. Urda*, 23 Pa.Cmwlth. 607, 353 A.2d 61 (1976) *cert. denied* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977). The validity of the statutes at issue in these cases was sustained because the minimal constitutional infringements involved were outweighed by the state's compelling interests. The greater the state's limitation of protected rights, however, the greater the justification necessary to support the statute. None of the statutes considered impinged upon protected First Amendment freedoms to the extent mandated by Section 1614, which clearly limits, and under certain circumstances absolutely prohibits, the publication of political speech.

nized as laudable in *Buckley*,[12] it is constitutionally infirm under this test.

## V

■ The Commonwealth argues that Section 1614 places no more than an incidental burden on expression protected by the First Amendment, since it imposes upon the political speaker a mere requirement that he give advance notice to his opponent of the contents of covered political communications. Accordingly, the Commonwealth contends that Section 1614 should be deemed valid under the well recognized rule that the state may adopt reasonable time, place, and manner regulations that do not discriminate among speakers or ideas in order to further an important governmental interest. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975). We disagree.

■ Unlike valid time, place, and manner regulations, Section 1614 is likely to inhibit substantially the decisions of political candidates regarding the content and timing of their final communications to the electorate immediately before the election. For example, the notice required by Section 1614 is, as indicated earlier, notice by registered mail sufficient to permit the opponent to publish a contemporaneous response in the same medium. Given a situation in which during the closing days of the campaign a candidate discovers material information regarding his opponent, constraints imposed by media lead times (the time necessary for the actual scheduling and preparation of the publication or broadcast) would severely limit the candidate's ability to disseminate the information. If, in addition to these constraints, the candidate is required under penalty of post–

12. We note that the *Buckley* holding has been further refined. In *Let's Help Florida v. McCrary*, 621 F.2d 195 (5th Cir., 1980), the Court ruled unconstitutional a statute limiting contributions to political referendum organizations because the statute limited protected expression without furthering its intended goals. *See also C & C Plywood Corporation v. Hanson*, 583 F.2d 421, 424–25 (9th Cir. 1978); *Citizens Against Rent Control v. City of Berkley*, 99 Cal. App.3d 736, 160 Cal.Rptr. 448, 451–55 (Ct.App., 1st Dist. 1979).

publication prosecution to notify his opponent by registered mail of the advertisement in time for the opponent to prepare and publish a response (which is also subject to the constraints of media lead times), the candidate must choose to forgo publication or to risk prosecution. Since Section 1614 applies without regard to the truth or knowing falsity of covered advertisements, even the candidate possessed of absolutely truthful information of critical importance regarding his opponent is faced with this chilling Hobson's choice. Section 1614 requires the candidate to choose in favor of suppression, and thus impermissibly abridges protected speech. *See N.A.A.C.P. v. Alabama ex rel. Flowers,* 377 U.S. 288, 307, 84 S.Ct. 1302, 1313, 12 L.Ed.2d 325 (1964); *Cantwell v. Connecticut,* 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

Section 1614 operates to chill speech in yet another way. Suppose a candidate has become clearly identified in the public mind with a particular political position. Suppose further that in the final hours of the campaign, when it is impossible to provide the requisite notice, his opponent wishes to publish an advertisement attacking the validity of this view. A counseled candidate might well be advised, in the face of the broad interdiction of Section 1614 requiring advance notice of "any [original] advertisement referring to an opposing candidate for the same office...", that the issue–oriented advertisement would be covered by the statute. Given this advice, which under the literal wording of the statute is not frivolous, the cautious candidate might decide to either abandon the proposed advertisement or reword it in an effort to excise any implicit reference to his opponent's views. In this context, Section 1614 operates to censor the content of primarily ideological communications or to suppress them altogether.

In addition, we note that although advance notice requirements generally may be reviewable under the time, place and manner doctrine, this analysis totally fails to account for the practical operation of Section 1614. First, although the statute is content neutral in that it applies

without regard to the particular content or message of advertisements making reference to an opponent, it is indeed content specific in that the notice requirement itself is triggered only by political advertisements that engage in character–oriented as opposed to issue–oriented debate. To the extent that the statute, through its deterrent sanctions, thus operates to prefer a particular kind of political discourse, it is infirm. *Cf. Police Department of Chicago v. Mosely*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).[13]

From the foregoing, it is readily apparent that the broad sweep of the Section 1614 notice requirement places a substantial burden on the candidate's ability to engage in protected political discourse. Further, the inhibitory effect of that requirement will in many cases work directly counter to the governmental interest in providing voter access to accurate information about candidates and to robust debate on the issues. In summary, even a cursory look at the statute's probable operation demonstrates that its potential for suppressing vital last–minute political expression is equally as grave as that considered in *Mills v. Alabama, supra.* It follows from *Mills* that since the governmental interest asserted in support of the statute, although a legitimate and important one, is inadequate to justify the substantial burden imposed on protected speech, the statute must fall.

The order of the Superior Court is reversed.

ROBERTS, J., filed a concurring opinion.

NIX, J., filed a dissenting opinion.

**13.** Indeed, to the extent that such a preference is implicit in the legislative design, it is arguable that the primary purpose of Section 1614 lies not, as the Commonwealth urges, in the promotion of the societal interest in creating an informed electorate, but in the less exalted desire to protect the reputational interests of candidates. This purpose is clearly inadequate to sustain a law that places even a minimal constraint upon protected political expression. *Cf. Monitor Patriot Co. v. Roy, supra.*

ROBERTS, Justice, concurring.

I agree with the majority that section 1614 of the Election Code is constitutionally infirm. I disagree, however, with the majority's suggestion that, under *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), constitutional limitations on political speech may be imposed. *Buckley* did reject a free speech challenge to provisions of the federal election laws placing limits upon contributions to candidates or political committees. It did so, however, only because the limits worked "only a marginal restriction upon the contributor's ability to engage in free communication." 424 U.S. at 620–21, 96 S.Ct. at 635. Indeed, *Buckley* struck down provisions of the same laws placing limitations upon expenditures "relative to a clearly identified candidate" and on candidates' individual spending. The Court concluded that, unlike the contribution laws, expenditure provisions restrict the communication of political thought and thus "limit political expression 'at the core of our electoral process and of the First Amendment freedoms.' *Williams v. Rhodes*, 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968)." 424 U.S. at 39, 96 S.Ct. at 644. Thus *Buckley* casts grave doubt on the constitutionality of any limitation of political speech. See also *Mills v. Alabama*, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966).

NIX, Justice, dissenting.

I remain unconvinced that the statute in question[1] offends the protection afforded political speech by the First and Fourteenth Amendments to the Constitution of the United States.

## I.

In determining the constitutionality of a statute, we may presume that the General Assembly of the Commonwealth

1. Act of June 3, 1937, P.L. 1333, Art. XVI, § 1614, *added*, Act of December 28, 1972, P.L. 1658, No. 353 § 1, 25 P.S. 3234 (repealed, Act of October 4, 1978) (current version 26 P.S. § 3258(b) Supp.1980–1981).

does not intend to violate the Constitution of the United States or of this Commonwealth.[2] Further, statutes are to be construed whenever possible to uphold their constitutionality. *In re William L.*, 477 Pa. 322, 383 A.2d 1228 (1978). An act of the General Assembly may not be declared unconstitutional unless it *clearly, palpably,* and *plainly* violates the Constitution. *Singer v. Sheppard,* 464 Pa. 387, 346 A.2d 897 (1975).

The appeal before us is a facial challenge to the regulatory statute which requires adequate notice by registered mail to a political opponent when a candidate for public office places an advertisement referring to the political opponent with a television or radio broadcasting station, newspaper or periodical, to be broadcast or published within forty–eight hours immediately prior to an election or published in a weekly newspaper or periodical during the eight days immediately prior to the election. As was stated by our Superior Court in this case, *Commonwealth v. Wadzinski*, 266 Pa.Super. 56, 403 A.2d 91 (1979):

The avowed purpose of this statute is to prevent media presentation of one candidate's, or his party's, views of the opponent, by way of advertisement, within that crucial period immediately before an election, without notice so that the opponent does not have time to respond. In this era of increased spending on political advertisements, *the obvious goal is to remove the disadvantageous and unfair results possible through a last minute, one–sided "smear" campaign.* In what might be referred to as a battle of media advertisements, under this statue the opposing candidate must be forewarned and given the chance to answer the ads of the other side. (Emphasis added)

The majority cites Pa.Legis.J. § 1328–30 (daily ed. May 9, 1972) for its finding that the "purpose of Section 1614 is to prevent misleading, false or scandalous campaign charges, published immediately prior to an election, from going unrebutted and thus improperly swaying the result of the election." The majority fails to recognize that that articulation

2. 1 Pa.C.S.A. § 1922(3) (Supp. 1977–1978).

of purpose is but another way of stating the state's interest in "preserving the integrity of the electoral process, preventing corruption, and 'sustain[ing] the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government'", *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 789, 98 S.Ct. 1407, 1422, 55 L.Ed.2d 707 (1978) quoting *United States v. Automobile Workers*, 352 U.S. 567, 570, 77 S.Ct. 529, 530, 1 L.Ed.2d 563 (1957), by protecting the process of choosing political leaders. Through inadequate analysis the majority arrives at the fallacious position at p. 131, n.13, that it is arguable that the primary purpose of Section 1614 lies in a desire to protect the reputational interests of candidates.

The majority today has chosen to ignore its duty[3] to sustain the constitutionality of the statute by giving it a narrowing construction. The majority has also chosen to ignore the guidelines of the Supreme Court. In *United States v. Thirty–Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971) the Court said:

"[w]hen the validity of an act of Congress is drawn into question, and . . . a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932).

Although the general rule controlling standing to challenge the constitutionality of statutes has some exceptions, one exception applicable in the area of free speech is overbreadth of the statute.[4] The overbreadth doctrine should be

---

**3.** See note 2, *supra*; *In re William L., supra*; and *Singer v. Sheppard, supra.*

**4.** A succinct statement of the overbreadth doctrine is set forth in an annotation, *Supreme Court's Views As To Overbreadth of Legislation In Connection With First Amendment Rights*, 45 L.Ed.2d 725, 731 (1975):

". . . the general rule [controlling] standing of a party to challenge the constitutionality of legislation is that a litigant to whom a statute may constitutionally be applied will not be heard to chal-

applied with restraint, according to Mr. Justices Powell, Burger and Blackmun, dissenting in *Rosenfeld v. New Jersey*, 408 U.S. 901, 907, 92 S.Ct. 2479, 2482, 33 L.Ed.2d 331 (1972) because 1) a judicial–legislative confrontation often results from application of the overbreadth doctrine, and 2) it is a departure from the normal method of judicial review. In 1973 the Supreme Court said in *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830, "Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." Also, the deterrent effect on legitimate expression must be both real and substantial. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975). Restated, it is not the Court's task to strike down a statute if it can, but to construe it so as to comport with constitutional limitations. Cf. *United States Civil Service Commission v. Letter Carriers*, 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973). In *Letter Carriers* a federal and a state statute prohibiting political activities of government employees were upheld against challenges of overbreadth.

Overbreadth scrutiny should not be rigid when examining a statute that regulates conduct in the shadow of the First Amendment by doing so in a neutral, noncensorial manner, for facial overbreadth adjudication attenuates as the behavior involved moves from "pure speech" toward conduct. *Broadrick v. Oklahoma*, 413 U.S. at 614, 93 S.Ct. at 2917.

The majority opinion, *ante* at 42, n.10, finds that Section 1614 "is not concerned with the regulation of conduct ..." This important finding is preemptorily made without analysis of Section 1614 which is not addressed to speeches, per se. It is not a "pure speech" statute. It puts a condition precedent to the "plac[ing of] an advertisement referring to

lenge the statute on the ground it may conceivably be applied unconstitutionally to others, in situations not before the court; a closely related principle is that constitutional rights are personal and may not be asserted vicariously. However, the court has recognized some limited exceptions to this rule, but only in the presence of the most 'weighty countervailing policies.' ... One of the exceptions, in the area of the First Amendment, to the traditional rules of standing permits attacks on overly broad statutes."

an opposing candidate." This is a regulation of conduct in the shadow of the First Amendment. "Place an advertisement" are the significant words in the statute for the purposes of deciding whether the statute is concerned with the regulation of conduct. The statute in this case involves both conduct and speech. Therefore, the scrutiny should not be so rigid as to invalidate the entire statute, thereby prohibiting the Commonwealth from enforcing the statute against conduct that is admittedly within its power to proscribe. See *Broadrick v. Oklahoma*, 413 U.S. at 615, 93 S.Ct. at 2917.

## II.

We recognize that a determination of a facial challenge is of no little difficulty. The majority concedes some speech is not constitutionally protected. Knowing and reckless falsity is accorded no greater constitutional immunity when made in a political campaign than when made under other circumstances. Section 1614 proscribes such speech if coupled with proscribed conduct; i. e., if placed in an advertisement and adequate notice is not given the besmirched opponent. Criminal sanctions are applied if the section is disregarded. The interest in deterring last–minute falsity so as not to deceive the voters and thereby aid the preservation of the integrity of the electoral process is an interest of highest importance. Cf. *United States v. Automobile Workers, supra.* Such deterrence is also a furtherance of the high interest of preserving public confidence in government by democratic process. Cf. *United States Civil Service Commission v. Letter Carriers, supra.* "No institution is more central to the United States' system of representative democracy than the election." *Developments in the Law, Elections,* 88 Harv.L.Rev. 1111, 1114 (1975). It transcends "the preferred position of freedom of speech" [5] which in the

5. Mr. Justice Frankfurter, concurring in *Kovacs v. Cooper*, 336 U.S. 77, 96, 69 S.Ct. 448, 458, 93 L.Ed. 513 (1949), objected to the phrase "the preferred position of freedom of speech" as a deceptive formula that makes for mechanical jurisprudence. Quoting Mr. Justice Holmes' *Collected Legal Papers* at 306, Justice Frankfurter cau-

area of the conduct of campaigns for public office serves the highest and primary purpose of preserving a democratic system of government. The ascendancy of the First Amendment does not place freedom of speech on a plane with the government's obligation to preserve our democratic political process. According to the result of the majority's decision, freedom of speech is a more compelling interest than the integrity of the election process, for its decision protects deceptive campaign speech in order to avoid the possibilities that 1) a candidate's late discovery of material information about the opponent might be faced with severe restraints by media lead time if notice adequate for reply is required; 2) a chilling Hobson's choice of foregoing publication or risking prosecution because of media lead time constraints is a real limitation; and, 3) a last--minute attack on an opponent's political position might become censored in content to avoid the statute. A narrow reading of the statute eliminates the problems posed by the first two possibilities.[6] However, if scrutiny is employed, the first two possibilities of deterrence, being minimal,[7] are outweighed by the state's compelling interest.

The third possibility advanced is also unsubstantial. An attack upon an ideological or political position involving the opponent does not necessitate such last--minute decision making as to find the notice requirement heavily burdensome because of media lead time restraints. Employment of correct statutory interpretation procedure, acceptance of the Supreme Court's guidelines in facial challenges, recognition of the true purpose of Section 1614, and the primacy of the state's interest in preservation of the integrity of the election process in maintaining a democratic system of government obviates the spurious abridgments set forth by the majority.

tioned, "To rest upon a formula is a slumber that prolonged, means death."

6. There is no protected right to false speech or the placing of false advertisements.

7. The alleged media lead time deterrent is raised in argument, but not supported by evidence.

56

## III.

This case, involving freedom of speech rather than freedom of the press, is not controlled by *Mills v. Alabama*, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), nor by *Miami Publishing Company v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Both *Mills* and *Tornillo* were classified freedom of the press cases concerned with the liberty to disseminate expression broadly. The Speech Clause "may be viewed as a protection of the liberty to express ideas and beliefs." *First National Bank v. Bellotti*, 435 U.S. 765, 800, 98 S.Ct. 1407, 1428, 55 L.Ed.2d 707 (1978), citing *Lovell v. Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938). While Chief Justice Burger, concurring in *Bellotti*, says the Press Clause is not confined to newspapers and periodicals, *Id.* at 801, 98 S.Ct. at 1428, the Press Clause is not redundant. It refers to a liberty "complementary to and a natural extension of the Speech Clause liberty", *Id.* at 800, 98 S.Ct. at 1428. In the instant case protection of the Press Clause was not argued nor invoked as the constitutional right being abridged. Obviously, a facial challenge to a statute charging overbreadth in violation of the First Amendment protection of freedom of speech cannot be sustained or controlled by cases turning on issues arising from the protection afforded freedom of the press, a different if not greater or lesser liberty.

Finally, we turn to *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Avoiding the cautioned pitfall of mechanical jurisprudence, we believe the state's subordinating compelling interest in deterring campaign falsity so as to preserve the integrity of the election process in order to maintain a democratic government overrides such limitations of speech as may incidentally occur through sustaining Section 1614 assuming arguendo, the statute did limit protected speech and require scrutiny. *Buckley* struck down provisions of the federal election laws which limited expenditures "relative to a clearly defined candidate" and limited candidates' individual spending because the limitations impermissibly restricted the right of individuals to speak their

minds and make their views known. The limitations, in that case held to be unconstitutional, were found to be so substantial (because "virtually every means of communicating ideas in today's mass society requires the expenditure of money", *Buckley, supra,* at 19, 96 S.Ct. at 634) as to override the government's interests. In *Buckley* at 17, 96 S.Ct. at 633, the court held that even if the dependence of a communication on the expenditure of money operates to introduce a non–speech element causing the expenditure of money to be categorized as conduct, the government interest in support of the act under scrutiny in *Buckley* involved suppressing communication rather than regulating the non–speech element.

The limitations of speech and advertisement here are not so substantial as to be suppressive. The condition precedent of adequate notice to the opponent in this case, like the limitations upon political contributions in *Buckley,* entail (if any) a much lesser restriction upon the individual's ability to engage in free communication than expenditure limitations. *Buckley, supra,* at 20–23, 96 S.Ct. at 635–36. Last–minute campaign *speeches* are not proscribed nor limited incidentally. Only the conduct of placing an advertisement is regulated to require giving notice to the opponent.

I dissent.