**GOLDEN TRIANGLE NEWS, INC., a Delaware corporation t/d/b/a both Golden Triangle News and Mello News; Monroeville News, Inc.; Fairview Books, Inc. t/d/b/a Good N Plenty; B.L.V.D., Inc. t/d/b/a B.L.V.D. News; and North Hills News, Inc., on behalf of themselves and all others similarly situated, Petitioners,**

v.

**Hon. Thomas CORBETT, in his official capacity as Attorney General for the Commonwealth of Pennsylvania; and Col. Paul Evanko, in his official capacity as Commissioner, Pennsylvania State Police, Respondents.**

Commonwealth Court of Pennsylvania.

Heard Dec. 20, 1996.
Decided Jan. 23, 1997.

Carl Max Janavitz, Pittsburgh, for petitioner, North Hills News, Inc.

J. Michael Murray, Cleveland, OH, for petitioners, Golden Triangle News and Monroeville News.

Paul J. Cambria, Jr., Buffalo, NY, for petitioners, Fairview Books and B.L.V.D.

Kemal A. Mericli, Pittsburgh, for respondents, Hon. Thomas Corbett and Col. Paul Evanko.

LEADBETTER, Judge.

On December 16, 1996, petitioners filed a petition for review in the nature of a complaint in equity on behalf of themselves as well as other similar adult-oriented establishments.[1] According to the averments of their petition, petitioners are engaged in the retail sale of general interest magazines, novelty items and non-obscene, sexually-oriented magazines and videotapes. In addition, petitioners make available to their patrons non-obscene, sexually explicit videotapes which can be rented or viewed on their premises in enclosed booths, cubicles or stalls. In Count I of their petition, petitioners seek a declaration that Act 120 of 1996 (the Act)[2] is unconstitutional[3] on the basis that it, *inter alia:*

1. The Commonwealth Court has original jurisdiction of all *civil actions or proceedings against* the Commonwealth, including any officer thereof, acting in his official capacity, except in certain circumstances not applicable to the instant action. *See* 42 Pa.C.S. § 761.

2. 68 Pa.C.S. §§ 5501–5509. The Act took effect on December 16, 1996.

 In general, the Act *imposes various restrictions* on adult-oriented establishments in order to discourage the use of such places for the commission of sexual acts and prostitution, which promote the spread of communicable diseases, including AIDS. 68 Pa.C.S. § 5501(a). For instance, the Act requires that the interior of an adult-oriented establishment be well lighted at all times and that the interior portion of any booths or cubicles where adult entertainment may be viewed be visible from a common area of the premises. 68 Pa.C.S. § 5503(b). The Act further provides that it shall be unlawful to install enclosed booths or cubicles for any purpose. 68 Pa.C.S. § 5503(b). The Act also prohibits any apertures in the partitions between subdivisions of any portion of the premises, in order to prevent persons on opposite sides of the *partitions from engaging in sexual activity to-*gether. 68 Pa.C.S. § 5503(c).

 Pursuant to the terms of the Act, adult-oriented establishments are to be open to inspection at all reasonable times. Furthermore, *a violation of* the Act constitutes a summary offense which is punishable by fine or imprisonment. 68 Pa.C.S. §§ 5505 and 5508.

3. Specifically, Petitioners aver that the Act violates Article I, §§ 1, 7 and 8 of the Pennsylvania Constitution. Article I, § 1 provides:

 All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

 Article I, § 7 provides, in turn, as follows:

 The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free commu-

(1) imposes a prior restraint on petitioners' right to engage in the dissemination of constitutionally protected expression; (2) chills the exercise of both petitioners' and their patrons' exercise of constitutional rights; (3) constitutes an impermissible content-based restriction on protected expression; (4) is unconstitutionally vague; (5) authorizes random warrantless searches without the existence of probable cause; and (6) fails to employ the least restrictive means to further any legitimate governmental interest. In Count II of the petition, petitioners seek injunctive relief on the basis that enforcement of the Act will cause irreparable harm.

In conjunction with their petition for review, petitioners filed the motion now before this court requesting that respondents be preliminarily enjoined from enforcing the provisions of the Act.[4] A hearing on the motion for preliminary injunction was held on December 20, 1996. Although testimony was not taken at that time, the parties entered into stipulations of fact for purposes of the preliminary injunction hearing only. In addition, briefs were submitted and extensive oral argument was presented.

■ In order to obtain a preliminary injunction, petitioners must demonstrate that the right to relief is clear, the need for relief is immediate and the injury will be irreparable if the injunction is not granted. *Zebra v. School Dist. of the City of Pittsburgh*, 449 Pa. 432, 436, 296 A.2d 748, 750 (1972). A preliminary injunction is an extraordinary remedy which is to be granted only when each of these factors has been clearly established.

*Committee of Seventy v. Albert*, 33 Pa. Cmwlth. 44, 381 A.2d 188, 190 (1977).

In assessing whether petitioners have demonstrated that their right to relief is clear, we must first consider the heavy burden which must be met by persons seeking to enjoin enforcement of a criminal statute. In *Cooper v. McDermott*, 399 Pa. 160, 159 A.2d 486 (1960), the Pennsylvania Supreme Court stated:

While there have been rare and unusual instances wherein courts of equity have enjoined public officers from proceeding with the enforcement of penal statutes, in those cases the validity of the statutes under which the proceedings had begun was seriously and substantially challenged *and, in addition,* it was clearly apparent that irreparable damage and harm would be done to property by a continuation of the prosecution. Both of these elements are indispensable.

*Id.* at 163, 159 A.2d at 489 (emphasis in original) (citations omitted). Moreover, all legislative actions are entitled to a strong presumption of constitutionality. 1 Pa.C.S. § 1922(3); *Pap's A.M. v. City of Erie*, 674 A.2d 338, 341 (Pa.Cmwlth.1996). For the reasons set forth below, the court holds that petitioners have not sustained their burden.

■ Turning to the constitutional claims, petitioners first argue that the Act's requirement that the display of constitutionally protected materials occur in well-lighted areas, which are open and visible from a common area, imposes an unconstitutional burden on their expressive freedoms. According to petitioners, these provisions will prohibit them

nication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty....

Finally, Article I, § 8 provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

4. Petitioners originally commenced a class action lawsuit in the Court of Common Pleas of

Allegheny County. The defendants in that action were the respondents named herein, as well as various other political subdivisions and their district attorneys. Due to the fact that the court of common pleas lacked jurisdiction over the Commonwealth parties, it transferred the matter to this court. The petitioners subsequently commenced this action against respondents and, thereafter, moved for this court to take ancillary jurisdiction over the remaining defendants named in the original suit. On December 16, 1996, this court denied petitioners' motion for ancillary jurisdiction without prejudice to file a new petition for review naming additional parties as respondents.

from displaying non-obscene videos to law-abiding patrons in the privacy of an enclosed area and in the traditional darkness of a movie theater, and, consequently, their patrons will be prohibited from viewing their materials in the desired and customary setting.

In addressing whether the regulation involved does violate Article I, § 7 of the Pennsylvania Constitution,[5] we must first determine whether the regulation constitutes a direct or "prior" restraint upon speech or whether it is merely a time, place and manner restriction. This distinction is critical because it determines the standards by which the court must analyze the statute.

Petitioners, relying heavily upon *Insurance Adjustment Bureau v. Insurance Comm'r*, 518 Pa. 210, 542 A.2d 1317 (1988), argue vigorously that the Act's restrictions are a direct or prior restraint. In *Insurance Adjustment Bureau*, the Pennsylvania Supreme Court addressed whether a statutory provision, which prohibited public adjustors from soliciting business within twenty-four hours of a disaster, unconstitutionally restricted freedom of speech. There, the Insurance Adjustment Bureau (the Bureau) argued that the twenty-four hour ban on solicitation impermissibly burdened its members' right to free speech because public adjusters routinely approached property owners within hours of a disaster in order to explain their services (and begin work, if retained). The Bureau further argued that the restricted time period was crucial to their communication because it was often necessary to locate property owners before they moved to a temporary, unlisted location due to the disaster. The Commonwealth argued, on the other hand, that the time restraint, which

did not ban speech altogether, was permissible because it was a reasonable time, place and manner restriction.

The Supreme Court quite clearly concluded that the restriction constituted a prior restraint when it opined as follows:

> The Commonwealth, of course, asserts that the restrictions involved in this case are only time, place and manner restrictions, since public adjusters and public adjuster solicitors are not banned altogether from soliciting business. Although it is true that the restriction in this case affects only twenty-four hours, the period of time immediately following the disaster may be the only time during which the property owner can be located before moving to an unknown address because of disaster....

*Id.* at 224–25, 542 A.2d at 1323. This conclusion is further supported by the court's statement that "Article I, Section 7 [of the Pennsylvania Constitution], will not allow the *prior restraint* or other restriction of commercial speech by any governmental agency where the legitimate, important interests of government may be accomplished practicably in another, less intrusive manner." *Id.* at 225, 542 A.2d at 1324.

 *Insurance Adjustment Bureau*, however, does not command the conclusion that the regulations now before the court constitute a prior restraint. A prior restraint is a "prohibition *on speech* in advance of its publication or expression," and a restraint must "unduly burden the *expression*" before it will be in violation of Article I, § 7. *Pap's A.M.*, 674 A.2d at 345 (emphasis added). *See also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504

---

5. Petitioners have not set forth a claim based upon the First Amendment to the United States Constitution. This court assumes that is because similar restrictions on adult entertainment establishments have consistently withstood First Amendment challenges. *See generally* cases cited in *Time Square Books, Inc. v. City of Rochester*, 223 A.D.2d 270, 273–74, 645 N.Y.S.2d 951 (1996). Petitioners have argued, however, that the Pennsylvania Constitution affords greater protection to expression than does the First Amendment.

The distinction between the state (least intrusive practicable manner to accomplish important

government interests) and the federal standards are discussed in *Insurance Adjustment Bureau v. Insurance Comm'r*, 518 Pa. 210, 542 A.2d 1317 (1988).

However, the cases relied upon by petitioners for the proposition that Article I, § 7 is more expansive than the First Amendment do not involve time, place and manner restrictions on speech and, therefore, are not apposite. Indeed, we note that early Pennsylvania decisions took the view that time, place and manner restrictions on free speech did not raise a constitutional issue. *See e.g., Commonwealth v. Grochowiak*, 184 Pa.Superior Ct. 522, 136 A.2d 145 (1958).

(1991). Applying these principles, we have held that an ordinance which prohibits public nudity does not constitute a prior restraint on the expression involved in erotic dance merely because erotic dancers are required to wear pasties and G-strings in order to comply with the ordinance. *Pap's A.M.*, 674 A.2d at 345. Specifically, we concluded that the ordinance did not pose a direct restraint on expression because (1) it did not regulate the expressive element of the dance, but rather, it regulated the *manner* of the dance and (2) the requirement that dancers wear pasties and G-strings was not unduly burdensome. *Id.*

Unlike the statute involved in *Insurance Adjustment Bureau*, which completely banned all speech for a period of time critical to the effectiveness of the communication, Act 120 does not ban or restrict speech or expression for any period of time. The petitioners remain free to exhibit, disseminate and sell the very same materials that they exhibited, disseminated and sold prior to the effective date of the Act. The Act does not impose any restrictions on either the petitioners' ability to display their materials or their patrons' ability to access them, on or off petitioners' premises. Indeed, the Act specifically abjures any restriction on the communication itself,[6] and restricts only the *manner* in which such materials may be viewed in *one* location.[7] The communication itself remains unchanged.

Petitioners argue, however, that the ability to view videotapes in a dark, private environment is so intertwined with the nature of the communication that restraining this environment is tantamount to restraining the speech itself. We disagree. Ambiance, in and of itself, has never enjoyed constitutional protection, and darkness and isolation have no inherent communicative aspects.[8]

■ Indeed, even "when 'speech' and 'non-speech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the non-speech element can justify incidental limitations on First Amendment freedoms" unless a disproportionate burden is placed upon First Amendment expression. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 702–03, 106 S.Ct. 3172, 3175, 92 L.Ed.2d 568 (1986), quoting *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968) and distinguishing *Minneapolis Star & Tribune Co. v. Minnesota Comm'r. of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). Thus, in *Commonwealth ex rel. Preate v. Danny's New Adam & Eve Bookstore*, 155 Pa.Cmwlth. 281, 625 A.2d 119 (1993), we noted that illicit "sexual activity carried on in a bookstore manifests no element of protected expression." *Id.* 625 A.2d at 122, and held that closure of the bookstores because of the illicit activities did not implicate First Amendment concerns. While the analysis used in *Arcara* and *Danny's* is arguably applicable here, we decline to take that approach. First, the Act does impose some restriction upon the manner in which the protected expression may be conveyed. Second, statutes virtually identical to Act 120 have been analyzed under the standards applicable to time, place and manner restrictions. *Mitchell v. Commission on Adult Entertainment Establishments*, 10 F.3d 123 (3d Cir.1993).[9] *See also Ellwest Stereo Theatres, Inc. v. Wenner*, 681 F.2d

6. See Section 5501(b) of the Act.

7. It was conceded at oral argument that the same videos available for viewing in the booths may also be rented for off-premises viewing.

8. Petitioners have specifically disclaimed any cause of action based upon a right to privacy, and no such right has been recognized in a public place such as petitioners' establishments.

9. *Pap's A.M.* and *Barnes* utilized a slightly different analysis for determining whether nude dancing statutes violate the First Amendment. There, based upon *O'Brien*, it was stated that a statute regulating speech can survive scrutiny if it: (1) is within the constitutional power of the government to regulate; (2) furthers an important or substantial government interest; (3) is unrelated to the suppression of free expression; (4) imposes an incidental restriction on alleged First Amendment freedoms which are no greater than that which is essential for the furtherance of the governmental interest; and (5) is designed to prevent secondary effects associated with adult entertainment. As was noted in *Mitchell*, however, courts which have considered the constitutionality of an open booth ordinance using both frameworks have reached the same outcome. 10 F.3d at 131 n. 7.

1243 (9th Cir.1982). Accordingly, we will review the statute using that standard.

■■■ The threshold issue in a case involving time, place and manner restrictions is whether the regulation is content based or content neutral. In *Mitchell,* the Third Circuit addressed the constitutionality of a Delaware statute which, as here, required adult entertainment establishments to eliminate all closed booths in which patrons could view videos unless one side of the booth was open and visible to an adjacent public room. The court stated, in pertinent part, as follows:

> [I]f the regulation of sexually explicit materials is aimed primarily at suppression of First Amendment rights, then it is thought to be content-based and so presumptively violates the First Amendment [to the United States Constitution]. But if the regulation's predominant purpose is the amelioration of socially adverse secondary effects of speech-related activity, the regulation is content-neutral and the court must measure it against the traditional content-neutral time, place, and manner standard. Under *Renton [v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) ], reasonable time, place, and manner regulations of protected speech are valid if: (1) they are justified without reference to the content of the regulated speech; (2) they are narrowly tailored to serve a significant or substantial government interest; and (3) they leave open ample alternative channels of communication.

*Mitchell,* 10 F.3d at 130 (citations, quotations and footnotes omitted).

■■ Petitioners argue that the statute is content-based because it applies only to businesses that disseminate adult entertainment. However, regulations which apply to a particular category of speech because the behavior sought to be regulated happens to be associated with that type of speech, are content-neutral as long as they can be justified without reference to the content of the speech. *Mitchell,* 10 F.3d at 137; *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 49, 106 S.Ct. 925, 929–30, 89 L.Ed.2d 29 (1986). Specifically with respect to the neutral content of the Delaware statute, the *Mitchell* court stated:

> The principal inquiry in determining content neutrality, in speech cases generally and in time, place or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. Content-neutral speech regulations must be justified without reference to the content of the regulated speech. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

*Id.* at 131. (citations and quotations omitted). As was noted in *Renton:*

> To be sure, the ordinance treats theaters that specialize in adult films differently from other kinds of theaters. Nevertheless, as the District Court concluded, the Renton ordinance is aimed not at the content of the films shown at "adult motion picture theaters," but rather at the secondary effects of such theaters on the surrounding community. The District Court found that the City Council's "predominate concerns" were with the secondary effects of adult theaters, and not with the content of adult films themselves.
>
> . . . .
>
> In short, the Renton ordinance is completely consistent with our definition of "content-neutral" speech regulations as those that "are justified without reference to the content of the regulated speech." *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 [96 S.Ct. 1817, 1830, 48 L.Ed.2d 346] (1976).

475 U.S. at 41, 106 S.Ct. at 925. Pennsylvania law does not differ in this regard. In *Commonwealth v. Cancer Fund of Am., Inc.,* 153 Pa.Cmwlth. 124, 620 A.2d 647, 651 (1993), we noted that "even if a regulation has an operational discriminatory effect on certain speakers, the regulation will be upheld if the governmental purpose is not related to the content of the speech." *Id.* 620 A.2d at 651.

Applying the above analysis to the Act's prohibition against dimly-lit and enclosed viewing areas, we reach the same conclusion as did the court in *Mitchell.* First, Section

5501 specifically states that in enacting Act 120, the Legislature did not intend to restrict or limit the constitutional rights of any patron or establishment to view, buy, sell, distribute or exhibit any communicative materials, including those which are sexually explicit. *See* 68 Pa.C.S. § 5501(b). The statute, by its terms, is designed to promote the health, safety and welfare of patrons and citizens of the Commonwealth by discouraging the occurrence of illicit sexual activities which occur in places such as petitioners' establishments and which pose a serious threat to public health through the transmission of sexually transmitted diseases, including AIDS. 68 Pa.C.S. § 5501(a). The Act's provisions do not ban, or limit access to or availability of the sexually explicit videos; they merely regulate the noncommunicative aspects of the environment where the videos are disseminated and viewed. Therefore, we conclude the regulations are content neutral.

■■■ Having made this determination, we turn to the balance of the test described in *Renton:* 1) that the law is designed to serve a substantial government interest; 2) that it is "narrowly tailored" to affect only that category of establishments shown to produce the unwanted secondary effects; and 3) that reasonable alternative avenues of communication remain. Petitioners do not contend that the Legislature's interest in reducing illicit sexual activity and the spread of communicable diseases is not a substantial government interest. Nor could they. The legislative findings [10] amply support the conclusion that such an interest exists. Moreover, these findings were based upon a nationwide range of experience and studies, evidence upon which a legislature may rely. *Renton,* 475 U.S. at 51–52, 106 S.Ct. at 930–31. Indeed, in *Pap's A.M.,* we stated that the governmental attempts to control the secondary effects associated with adult entertainment serve a substantial interest in promoting health, safety and welfare of the people. 674 A.2d at 343.

■■■ We likewise find that the restrictions imposed by the Act are narrowly tailored to achieve the statutory goals. Petitioners contend that there are less restrictive means of achieving the purposes of the Act and contend that the Commonwealth must demonstrate that such other measures were unsuccessful before this statute can pass constitutional muster. Petitioners' attempt to equate the concepts of "narrowly tailored" and "least restrictive means" is not supportable. However persuasive petitioners' argument might be in a prior restraint case, a "least restrictive means" analysis does not

---

**10.** These findings were:

(2) Statistics and studies performed in a substantial number of communities in this Commonwealth, in the United States and by the State of Delaware indicate that:

(i) large numbers of persons, primarily male, frequent adult oriented establishments, especially those which provide closed booths, cubicles, studios and rooms for the private viewing of so-called adult motion pictures, videotapes or live entertainment or a combination of motion pictures, videotapes and live entertainment;

(ii) the closed booths, cubicles, studios and rooms and holes in partitions between booths, cubicles, studios and rooms have been used by patrons, clients or customers of adult oriented establishments for the purpose of engaging in sexual acts;

(iii) male and female prostitutes have been known to frequent the establishments in order to provide sex for hire to the patrons, clients or customers within the booths, cubicles and rooms;

(iv) doors, curtains, blinds and/or other closures installed in or on the entrances or exits, or both, of the booths, cubicles, studios and rooms which are closed while the booths, cubicles, studios and rooms are in use encourage patrons using the booths, cubicles, studios and rooms to engage in sexual acts in the closures and through holes in partitions between the closures with prostitutes, patrons, clients or customers, thereby promoting and encouraging prostitution and the commission of sexual acts which result in the direct exchange of bodily fluids which put the participants at high risk for contracting communicable diseases, including AIDS, and which cause blood, semen and urine to be deposited on the floors or walls, or both, of the booths, cubicles, studios and rooms, which deposits could prove detrimental to the health and safety of other persons who may come in contact with such deposits; and

(v) the reasonable regulation and supervision of such adult oriented establishments tend to discourage sexual acts and prostitution, and thereby promote the health, safety and welfare of the patrons, clients and customers of these establishments.

68 Pa.C.S. § 5501(a)(2).

apply when a content-neutral time, place and manner restriction is at issue. *Mitchell,* 10 F.3d at 137.[11] The United States Supreme Court has specifically rejected the argument that a city must demonstrate that its chosen method of reducing undesirable secondary effects of adult entertainment is the best method in order to establish that its ordinance is narrowly tailored. *Renton,* 475 U.S. at 51–52, 106 S.Ct. at 930–31.

◾ Here, as in *Renton,* the Act is narrowly tailored in that it affects only that category of establishments which are associated with adverse secondary social effects. The findings set forth in the Act indicate that based upon statistics and studies conducted in other communities, regulation of other similar establishments has effectively discouraged sexual acts and prostitution. *See* Section 5501(a). Moreover, a restriction is deemed to be narrowly tailored if it promotes a substantial government interest that would be achieved less effectively without the regulation. *Mitchell,* 10 F.3d at 137. As is stated in footnote 11, other methods would be significantly less effective in combatting the harm at which the Act is directed. Thus, the court concludes that the instant regulations are narrowly tailored.

Finally, the lighting and open booth regulations leave alternative channels of communication available. In fact, the regulations do not preclude the original channel of communication, viewing videos on petitioners' premises. The Act provides only that if sexually explicit videos are to be viewed in a public place, they must also be viewed under circumstances in which only viewing may be done and any harmful secondary activities can be observed and stopped. Further, as petitioners conceded at oral argument, if patrons do not wish to view the videos in open, lighted places, they may rent them and view them in a place where they enjoy a right of privacy, such as their homes. Thus, since the Act does not bar petitioners or patrons from, *inter alia,* disseminating and viewing the same sexually explicit materials on petitioners' premises or elsewhere, both the original channels of communication and alternatives remain available. Accordingly, we conclude that the Act's prohibition against dimly-lit establishments and closed booths is a constitutional time, place and manner restriction.

◾ Petitioners also argue that the penalty provisions set forth in Section 5506 impose a prior restraint upon free speech in violation of Article I, § 7 of the Constitution. Section 5506 states, in relevant part:

> Upon judgment of the court ordering the violations to be abated, the court *may* order that neither the premises nor any part of the premises shall be occupied or used for any purpose for up to one year following the date of the court's order, but the court may, in its discretion, permit the premises to be occupied or used by the operator or owner if the operator or owner, or both, posts a bond or a joint bond in the discretion of the court with sufficient surety to be approved by the court in the penal and liquidated sum of not less than $1,000 nor more than $2,500....

68 Pa.C.S. § 5506(b)(2) (emphasis added). According to petitioners, Section 5506 constitutes a prior restraint because it allows a court to close an entire operation for up to one year, thereby completely suppressing all protected speech. This argument has been rejected by both this Commonwealth's appel-

---

11. Even if the Act were viewed under the strict standard applicable to prior restraints on fully-protected speech under Article I, § 7, the regulations would still be valid. Under that standard, as set out in *Insurance Adjustment Bureau,* the state must choose the least intrusive, *practicable* method to effect legitimate, important government interests. 518 Pa. at 225, 542 A.2d at 1324.

Although petitioners have suggested other methods which would intrude less upon the ambiance which their customers desire, such as self-policing their customers behavior, enforcing a one person per booth rule or cutting a few inches off the bottoms of the booths' doors, their suggestions do not appear to be *practicable* methods to effectuate the legitimate objectives of the Legislature. Indeed, some of the conduct sought to be prohibited on the basis that it creates a hazard of spreading communicable diseases does not necessarily involve two persons. Moreover, in a dark environment, the effectiveness of such suggestions is questionable at best. It is self-evident that the degree of a method's intrusiveness on patrons' privacy is directly proportional to effectiveness of achieving the statutory objectives.

late courts as well as the United States Supreme Court.

In *Commonwealth v. Allouwill Realty Corp., Inc.*, 330 Pa.Superior Ct. 32, 478 A.2d 1334 (1984), the Pennsylvania Superior Court affirmed an injunction order, padlocking two adult bookstores as public nuisances, pursuant to the Act of June 23, 1931, P.L. 1178, *as amended*, 68 P.S. § 467. Similar to Section 5506, the statute at issue in *Allouwill* also authorized the court to order that an offending building not be occupied or used for any purpose for one year. The bookstores, which were subject to the injunction, argued that the statute constituted a prior restraint in violation of Article I, § 7. The court disagreed, holding that the illicit sexual activities, and not the materials disseminated by the bookstores, served as the basis for the injunction. The statute's incidental effect on the dissemination of protected material did not render it unconstitutional. Moreover, as the court noted, the bookstores were free to disseminate their materials at another location. Similarly, the United States Supreme Court in *Arcara* found that the closure order did not constitute a prior restraint because (1) the closure of the bookstore did not prohibit the dissemination of such materials at another location and (2) the closure order was not imposed on the basis of the advance determination that the distribution of particular materials was objectionable. 478 U.S. at 706 n. 2, 106 S.Ct. at 3177 n. 2. Thus, we conclude that Section 5506 is constitutional.

■■■ Next, petitioners argue that certain sections of the Act are unconstitutionally vague because they fail to give a reasonable person notice of what is required in order to comply with the Act's provisions.[12] A statute is unconstitutionally vague when it "fails to provide reasonable notice of the conduct to the person charged with violating its provisions." *Commonwealth v. Gonzalez*, 403 Pa.Superior Ct. 157, 165, 588 A.2d 528, 532 (1991). Legislation violates vagueness requirements regarding adequacy of notice of prohibited conduct when its terms are so indefinite that men of reasonable intelligence are left to guess at its meaning and differ as to its application. *City of Philadelphia v. Cohen*, 84 Pa.Cmwlth. 200, 479 A.2d 32, 36 (1984); *Gonzalez*, 403 Pa.Superior Ct. at 166, 588 A.2d at 532. The criteria used in evaluating statutory language for vagueness is that of " 'flexibility and reasonable breadth' rather than 'meticulous specificity' or 'mathematical certainty.' " *Cohen*, 479 A.2d at 36 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222, (1972)). Moreover, the specificity of a statute must be weighed against the conduct in which the party challenging it has engaged. *Gonzalez*, 403 Pa.Superior Ct. at 166, 588 A.2d at 533.

■■■ In light of the standards set forth above, the court concludes that petitioners' claims of vagueness must fail. A reasonable person, using common sense, is not required to guess in order to ascertain what constitutes an "adult bookstore," "sexual activities," or "well-lighted" premises. For instance, the Act indicates that in order to be well lighted, adult-oriented establishments must be equipped with overhead lighting fixtures which provide a specified quantity of light in the areas where patrons are permitted access. *See* 68 Pa.C.S. § 5503(d). Thus, the term "well lighted" is not vague. Similarly, the terms "substantial" and "significant" have recognized meanings in the En-

12. Petitioners contend that the Act's definition of an "adult bookstore" is vague. The Act defines an "adult bookstore" as follows:

An establishment having a *substantial or significant portion* of its stock and trade in, or an establishment which, as *one of its principal business purposes*, offers for sale, books, films, video cassettes or magazines and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas, and in conjunction therewith has facilities for the presentation or adult entertainment for observation by patrons.

68 Pa.C.S. § 5502 (emphasis added). Specifically, petitioners object to the underlined phrases in the above definition as unconstitutionally vague. In addition, petitioners argue that the Act's requirement that the adult-oriented establishments be "well lighted" and that the booths, cubicles or stalls be visible from a "common area" are vague, as well. *See* 68 Pa.C.S. § 5503. Finally, petitioners assert that the definition of "sexual activities" is vague because it excludes, *inter alia*, "bona fide educational publications or films," which are undefined. *See* 68 Pa.C.S. § 5502.

glish language [13] and the use of such in the definition of "adult bookstore" does not render it vague merely because a percentage of business in one type of item is not specified. Limiting the definition of "adult bookstore" to establishments that meet a specific sales percentage would frustrate the Act's purpose by drawing arbitrary classifications.

Finally, petitioners contend that Section 5505 of the Act, which provides that adult-oriented establishments "shall be open to inspection at all reasonable times by inspectors," authorizes a warrantless search in violation of Article I, § 8 of the Pennsylvania Constitution. Specifically, relying on United States Supreme Court decisions, petitioners argue that Section 5505 is unconstitutional because it fails to, *inter alia*, define the scope of the search and limit the discretion of the inspecting officers. According to petitioners, Section 5505 authorizes a warrantless search of businesses at any time and for any reason. We disagree.

Initially, the court notes that it is compelled to construe a statute in a manner which is constitutional. *English v. School Dist. of Robinson*, 358 Pa. 45, 55 A.2d 803 (1947). In light of this rule of construction, the fact that Section 5505 fails to detail the scope of administrative inspections under the Act does not render it unconstitutional. The Deputy Attorney General, at oral argument, opined that any such inspection would necessarily occur during business hours, be limited to those areas which are open to the public and be conducted for the purpose of determining compliance with the Act. Indeed, the Deputy Attorney General's construction of Section 5505 is the only reasonable construction of the Act. An inspection which did not occur during business hours or which ventured into areas not open to the public, such as private management offices, would be a completely meaningless venture in that it would not reveal whether the operator was maintaining a well lighted establishment, prohibiting minors from loitering on the premises and maintaining visibility into the private viewing areas. We will not construe Section 5505 in such a way as to presume that the legislature intended a result that is absurd or unreasonable. *Unionville–Chadds Ford Sch. Dist. v. Rotteveel*, 87 Pa.Cmwlth. 334, 487 A.2d 109, 113 (1985).

Thus, while Section 5505 does not detail the limitations on the scope of an inspection in terms of time, place and purpose, the only reasonable construction of that section is one which is constitutional. Moreover, a court cannot invalidate a statute simply because it *might* be unconstitutionally applied.[14] *Hohe v. Casey*, 868 F.2d 69, 71 (3d Cir.1989), quoting *Robinson v. State of New Jersey*, 806 F.2d 442, 446 (3d Cir.1986).

Thus, after reviewing petitioners' constitutional challenges to the Act, this court concludes that petitioners have failed to demonstrate a probability of success on the merits, let alone a clear right to relief. Given that finding, the court will deal only briefly with the other elements necessary to obtain a preliminary injunction.

Petitioners have alleged that if an injunction is not granted, they will suffer irreparable harm in the nature of a loss of the right to free speech. We agree that a *purposeful* suppression of speech by the government constitutes irreparable harm for injunction purposes. *Hohe v. Casey*, 868 F.2d at 72–73, citing *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). However, as is detailed at length above, Act 120's restrictions on speech, if any, are minimal and incidental and, as such, do not constitute *per se* irreparable harm. *Id.*

Petitioners submit, via stipulation of fact number 29, that enforcement of the Act

---

**13.** *The Concise American Heritage Dictionary* (1980) defines "substantial" as, *inter alia*, "considerable in amount, extent." Similarly, "significant" is defined as, *inter alia*, "important, notable." Other than technical words, all words used in a statute are to be construed according to their common meaning and accepted usage. *Unionville–Chadds Ford Sch. Dist. v. Rotteveel*, 87 Pa.Cmwlth. 334, 487 A.2d 109, 112 (1985.)

**14.** In general, warrantless, administrative inspections in a regulated area of business are constitutional. *See generally Commonwealth v. Blosenski Disposal Service*, 523 Pa. 274, 566 A.2d 845 (1989).

will cause a percentage of their patrons to cease using their video booths. There is no stipulation or other proof, however, that the expected decline in the use of booths arises from the restriction on the manner in which the videos may be viewed, as opposed to the patrons' inability to engage in the conduct which the Act seeks to prohibit. Moreover, the parties' stipulation provides no basis to determine that patrons will cease to watch their videos as opposed to simply watching them elsewhere. Even if petitioners had produced evidence of this sort, given the continued ability of petitioners to display, and their patrons to view, the videos, and the availability of alternate means whereby videos can be viewed in other venues, it seems clear as a matter of law that there is no irreparable harm to free speech interests.

Petitioners' only other evidence regarding harm is set forth in stipulation of fact number 28. There, petitioners assert that it will be necessary for them to alter their premises in order to comply with the Act's lighting and open booth requirements. The Commonwealth argues, however, that an injunction will perpetuate the serious health hazards sought to be curbed by the Act. When the two competing interests are weighed, it is clear that the harm to the public is greater if the injunction were granted than the harm to the petitioners if the injunction were denied. Therefore, petitioners have failed to establish the requisite harm which would warrant the imposition of a preliminary injunction.

For all of the above-stated reasons, petitioners' request for a preliminary injunction is denied.

### ORDER

AND NOW, this 11th day of February, 1997, it is ORDERED that the above captioned opinion filed January 23, 1997, shall be designated OPINION rather than MEMORANDUM OPINION, and that it shall be reported.